Filed 2/18/21  Smith v. Ahlfeldt CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CATHERINE GILMOUR SMITH, | B289483 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. EC062581 |
| GARY AHLFELDT et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Donna Fields Goldstein and Benny C. Osorio, Judges. Affirmed as modified, and remanded with directions.

Carlson & Nicholas, Francisco J. Nicholas; Law Offices of Gregory R. Ellis, Gregory R. Ellis and Peter Gold for Defendants and Appellants.

Law Offices of James A. Gallo and James A. Gallo for Plaintiff and Respondent.

# INTRODUCTION

By all accounts, Brian Harrington is a very persuasive con man.[1] We are concerned here with his plan to defraud plaintiff and respondent, Catherine Gilmour Smith (Gilmour), a woman he described unflatteringly as "a gold mine."

From 2007 to 2011, Harrington pretended to be, among other things, a wealthy and successful investor. He lured the recently-divorced Gilmour into a romantic relationship and progressively extracted approximately $325,000 from her by offering to invest the money. Instead of investing the money, Harrington used it to support his lavish lifestyle—and the lavish lifestyle of another woman. But Harrington could not have executed this scheme successfully without laundering Gilmour's money. For that, he turned to the defendants and appellants Gary Ahlfeldt and his company, Madison Financial, Inc. (Madison Financial).

Ahlfeldt and Madison Financial (defendants) appeal from a judgment in favor of Gilmour following a bench trial in which the court found defendants liable of conspiring with Harrington to commit fraud. The court awarded Gilmour $325,000 in compensatory damages plus prejudgment interest, as well as punitive damages of $500,000 each against defendants.[2] The total award was approximately $1.5 million, jointly and severally.

---

[1] At least he was. He is currently serving a 17-year prison term resulting from some of the events relating to this appeal.

[2] As we explain *post*, Gilmour's actual damages are somewhat lower than the amount calculated by the court.

Defendants contend Gilmour's fraud claim is barred by the statute of limitations because, they argue, the evidence establishes as a matter of law that Gilmour either knew or should have known that something was amiss before June 2011, i.e., three years before she filed her complaint. We conclude the evidence is not as clear as defendants suggest and therefore reject the argument.

Further, defendants challenge both the statutory basis and the rate of the court's prejudgment interest award. We conclude that Gilmour is entitled to prejudgment interest at a rate of seven percent and will remand to the trial court for recalculation of prejudgment interest.

Finally, defendants argue the court's punitive damages award should be reversed. We conclude the court's finding that defendants acted with malice, oppression, or fraud is supported by substantial evidence. We reduce the amount of the award, however, in light of the evidence of defendants' financial circumstances and ability to pay the award.

## FACTUAL BACKGROUND[3]

During the time of the events described here, Harrington successfully represented himself to be an ex-Navy SEAL, a consultant for the CIA, a graduate of The Wharton School, a real estate mogul, and a wealthy and successful investor.

---

[3] The parties generally agree on the facts of the case and defendants have not challenged the court's factual findings. Accordingly, in stating the facts, we rely upon the court's thorough statement of decision on liability.

Gilmour is a divorced, single mother of two boys and a part-time model. Her modeling career began after she was crowned Rose Queen at the age of 17. Through modeling, she had accumulated a life savings of $400,000 to $500,000.

Ahlfeldt owns Madison Financial, a company that provided property management services and, at one time, mortgage brokering services. Ahlfeldt has been a licensed real estate broker since 1984. He is the sole shareholder, officer, and director of Madison Financial, a business he founded in 2005 so that he could work with Harrington to broker mortgages. Harrington had a considerable book of business and generated nearly all of Madison Financial's income. Harrington was good at his job and, in some years, earned as much as $800,000 in commissions. Ahlfeldt paid Harrington in cash or by writing checks to third parties specified by Harrington to pay his expenses.

Harrington began wooing Gilmour in 2007, shortly after her divorce from a successful businessman and restaurant owner. Gilmour and Harrington spent an increasing amount of time together and after a few months began a romantic relationship. Harrington was particularly kind to her young children.

Gilmour was impressed by Harrington's manner of dress and apparent wealth. He had a driver and appeared well-connected among successful people in the Pasadena area. Harrington told Gilmour that he was a partner at Madison Financial, a thriving investment firm, and she believed him.[4] Early on in their relationship, Harrington invited Gilmour to

---

[4] Madison Financial did not engage in the business of investing.

invest her savings with Madison Financial and allow him to manage her funds. She did.

Between October 2007 and March 2011, Madison Financial received $325,000 from Gilmour. Gilmour believed she was investing in gold, foreclosed properties, and real estate. For example, in October 2007, Gilmour gave Harrington $20,000 which he said he would use for a real estate investment in the Linda Vista area. The following month, she gave Harrington $35,000 to invest in a rental property in Aspen, Colorado. And in January 2008, Gilmour gave Harrington $100,000 to invest in the gold market. Gilmour continued writing checks to Madison Financial or to cash, as directed by Harrington, through early 2011. In all, Gilmour wrote checks to Madison Financial for investments totaling $238,000. An additional $87,000 was taken via forged checks written by Harrington from Gilmour's account and made payable to Madison Financial. Throughout this period, Harrington reassured Gilmour about the performance of her investments. Meanwhile, he removed bank statements and other financially-related correspondence from Gilmour's mailbox while she was not home.

Harrington did not invest one penny of Gilmour's money. Instead, he took Gilmour's checks to Ahlfeldt. Ahlfeldt either cashed the checks and gave the money to Harrington or deposited the checks into Madison Financial's operating account and then wrote checks from Madison Financial to persons and businesses as directed by Harrington. Harrington used the funds to support himself and another woman, Claudia Fisher. Ahlfeldt also used some of Gilmour's money for his own benefit by paying his

mortgage, paying off debts, and transferring money to accounts he used for property management business.[5]

Ahlfeldt knew that Gilmour did not have a business relationship with Madison Financial. Ahlfeldt had also been advised in 2003 by a private detective that Harrington was a convicted felon and a con man. But when Harrington began to present checks in large amounts from Gilmour, Ahlfeldt neither questioned Harrington nor reached out to Gilmour. He simply accepted Harrington's explanation that Gilmour gave Harrington the money to spend as he wished.

Ahlfeldt even concealed the scam from Gilmour at one point. In mid-2010, Gilmour contacted Ahlfeldt, who she had previously met in passing while she was with Harrington, and asked to meet with him. During a brief conversation at a coffee shop, Gilmour asked Ahlfeldt how her investments were performing. She had "invested" more than $300,000 at that point. Ahlfeldt told Gilmour that he was "unaware" of her investments. When Gilmour later confronted Harrington, he assured her that Madison Financial was a large company with many investors.

---

[5] By this point, Madison Financial had a very limited legitimate business purpose. Between January 2008 and October 2011, more than half of the money in the company's operating account came from Gilmour. During that time, only two percent of the expenditures from the operating account related to the business of Madison Financial. The vast majority of disbursements benefitted Fisher, Harrington, and Ahlfeldt. In addition, Ahlfeldt did not maintain standard business records for the company such as a bank register, general ledger, or any other means of tracking cash flow in and out of the company. Ahlfeldt kept check stubs but they often—and particularly with respect to payments directed by Harrington—contained only a few cryptic notations about their purpose.

Ahlfeldt could not be expected to know about her accounts because Harrington was managing them himself.

Toward the end of 2010, the romantic relationship between Gilmour and Harrington began to wane. Gilmour thought she might prefer to be friends rather than intimates but she trusted Harrington as a businessman and wanted him to continue managing her investments. In September 2011, the couple attempted to rekindle their relationship by spending a weekend together in Santa Barbara.

Everything changed, however, on October 4, 2011. Gilmour and Harrington dined at a restaurant together but after Harrington drank heavily and became abusive, Gilmour left the restaurant and demanded that Harrington's driver take her home. When Gilmour and Harrington arrived at Gilmour's home, she told Harrington she did not want him to come into her house. Harrington eventually forced his way inside where he assaulted and raped Gilmour.

Harrington was arrested the next day. While in custody, Harrington conspired with another inmate to kill Gilmour and her children. Luckily, the plot was foiled when a bomb was discovered in Gilmour's car. Harrington's criminal felony trial took place in 2014 and he was sentenced to a 17-year prison term.

After Harrington's violent attack, Gilmour became concerned about her investments. She immediately visited her bank to obtain copies of all the checks written from her account and discovered that Harrington had been forging checks. She eventually learned that her "investments" were not invested at all and had been used to benefit Harrington, Fisher, and Ahlfeldt.

# PROCEDURAL HISTORY

Gilmour filed the instant suit against Harrington, Ahlfeldt, Madison Financial, and others in June 2014.[6] The operative complaint contained 10 causes of action, of which three relate to defendants and the present appeal: fraud and deceit, conspiracy, and common counts (money had and received.) The court conducted an 11-day bench trial in May 2017 and issued a 35-page statement of decision containing its extensive factual findings and conclusions of law.

Briefly stated, the court found Gilmour to be a credible witness who was genuinely taken in by Harrington's fraudulent scheme. As to Ahlfeldt, the court found his testimony—in which he claimed he had no knowledge of Harrington's ploy and was just another victim of Harrington's—not credible. The court also found that Ahlfeldt was the alter ego of Madison Financial.

The court found Harrington liable on Gilmour's fraud claim and found that Ahlfeldt was also liable for fraud under a conspiracy theory. Alternatively, the court found Ahlfeldt and Madison Financial liable for a common count (money had and received). The court found that defendants took $325,000[7] from Gilmour by and through their fraudulent scheme.

The issue of punitive damages was tried over two days in October 2017 and the court again issued a detailed statement of decision. As to Ahlfeldt, the court found that his actions were reprehensible to a high degree as he had knowledge that

---

[6] Harrington defaulted and was imprisoned at the time of trial.

[7] As we explain, the correct amount of the compensatory award is $266,899.

Harrington was a con man, and that Gilmour wrote checks to Madison Financial but had no business with the company. That knowledge notwithstanding, Ahlfeldt deposited and/or cashed Gilmour's checks for Harrington and disbursed the money according to his instructions. Ahlfeldt also concealed the scheme from Gilmour when she asked him directly about her investments with Madison Financial. Additionally, Ahlfeldt benefitted financially from the fraudulent scheme.

The court initially planned to award Gilmour $100,000 in punitive damages. But after the hearing, in which counsel focused on defendants' reprehensible conduct and their intentionally chaotic document production regarding net worth, the court ultimately imposed punitive damages of $500,000 each against Ahlfeldt and Madison Financial, jointly and severally.

The court signed a judgment on February 16, 2018, awarding Gilmour $325,000 in compensatory damages plus prejudgment interest pursuant to Civil Code section 3291 running from the date of Gilmour's settlement offer to February 15, 2018. In addition, the court awarded $1,000,000 in punitive damages. The court determined the total award was $1,505,030.63, plus costs. The judgment, including punitive damages, was made against Ahlfeldt individually, Ahlfeldt as the alter-ego of Madison Financial, and Madison Financial, jointly and severally. Defendants timely appealed.

As we explain in detail below, the court entered a second, corrected judgment on April 20, 2018, nunc pro tunc, effective February 15, 2018. That judgment eliminated the reference to Civil Code section 3291 but was otherwise identical in substance to the previously entered judgment, awarding "the sum of $505,030.63, consisting of compensatory damages plus interest

through February 15, 2018; $1,000,000, as and for punitive damages, for a total of $1,505,030.63, plus costs[.]" Again, defendants timely appealed.

At defendants' request, we consolidated the two appeals for all purposes on June 11, 2019.

## DISCUSSION

Defendants offer three main arguments in this appeal. First, in challenging the judgment on the fraud/conspiracy cause of action, defendants contend that Gilmour's claim is barred by the statute of limitations. Second, with respect to the amount of the judgment, defendants assert Gilmour is only entitled to prejudgment interest under Civil Code section 3291 and any interest awarded should be calculated at seven percent per year rather than the 10 percent awarded by the court. And third, defendants assert the court's punitive damages award must be reversed because it is unsupported by substantial evidence and, in any event, is constitutionally excessive. We address these issues in turn.

### 1.   Gilmour's fraud claim is not barred by the statute of limitations.

Defendants assert Gilmour's fraud claim is barred by the statute of limitations because she was on inquiry notice of the fraud more than three years before she filed her complaint. They also argue that the court applied the wrong legal standard in assessing the limitations issue. We disagree.

### 1.1. Legal Principles and Standard of Review

The statute of limitations for fraud is three years. (Code Civ. Proc., § 338, subd. (d).)[8] Section 338, subdivision (d), " 'also codifies the delayed discovery rule, providing that a cause of action for fraud " 'is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.' " [Citation.]' " (*Britton v. Girardi* (2015) 235 Cal.App.4th 721, 733.) "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. … [T]he limitations period begins once the plaintiff ' " 'has notice or information of circumstances to put a reasonable person on inquiry … .' " ' [Citations.] A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110–1111 (*Jolly*).)

Resolution of a statute of limitations issue is normally a question of fact, unless the uncontradicted facts are susceptible of only one legitimate inference and the issue becomes a question of law. (Cf. *Jolly*, *supra*, 44 Cal.3d at p. 1112) [noting statute of limitations issue is typically question of fact but may be resolved

---

[8] All undesignated statutory references are to Code of Civil Procedure.

by summary judgment where undisputed facts support only one inference].)

### 1.2. Substantial evidence supports the court's finding that the fraud claim was timely.

The court found that Gilmour did not learn of Harrington's fraudulent activities until October 2011, after Harrington had raped and assaulted her and she became concerned about the investments she believed Harrington was managing for her. This factual conclusion is unchallenged and is supported by substantial evidence. Gilmour filed her complaint in June 2014, well within the three-year limitations period.

But as we have said, the statute of limitations may begin to run when the plaintiff is on inquiry notice, i.e., has an actual suspicion of wrongdoing or has knowledge of facts that would cause a reasonably prudent person to investigate. (*Jolly, supra,* 44 Cal.3d at pp. 1110–1111.) Although the court did not explicitly address the issue of inquiry notice in its ruling, the court made numerous factual findings bearing on the issue in considering whether Gilmour justifiably relied on Harrington's representations.

For instance, the court found that Harrington convincingly represented himself as an experienced businessman with an MBA from The Wharton School. He had a driver and appeared to be wealthy based on his lifestyle. Harrington also appeared to be well-connected with many successful people in Pasadena. And at least four witnesses testified at trial that they had been taken in by Harrington on one or sometimes multiple occasions. These findings support the court's conclusion that Gilmour was not alone in believing that Harrington was what he represented himself to be and support the court's implied finding that a

12

reasonably prudent person could have been taken in by Harrington's deception.

As for the specific deception Harrington employed on Gilmour, we note that "[t]he fraudulent concealment doctrine will also toll the statute of limitations under section 338, subdivision (d). '[T]he ground of relief is that the defendant, having by fraud or deceit concealed material facts and by misrepresentations hindered the plaintiff from bringing an action within the statutory period, is estopped from taking advantage of his own wrong.' (*Pashley v. Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 231.) To take advantage of this doctrine ' "the plaintiff must show ... the substantive elements of fraud ... and ... an excuse for late discovery of the facts." ' (*Snapp & Associates Ins. Services, Inc. v. Robertson* (2002) 96 Cal.App.4th 884, 890.)" (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1123.)

As described *ante*, there was substantial evidence that a great deal of information was concealed from Gilmour and prevented her from learning the truth about Harrington's scheme. Harrington stole Gilmour's bank statements and other materials from her mailbox as evidenced by the fact that he maintained a large file of her bank records and other financial documents at his office. Harrington also repeatedly told Gilmour that her investments were performing well and showed her market reports purportedly documenting that fact. And Harrington was not the only person concealing information. In June 2010, Ahlfeldt rebuffed Gilmour's inquiry about her investments by saying he was "unaware" of her investments— even though he had already cashed checks from her worth more than $300,000. Harrington explained away Ahlfeldt's purported

13

lack of knowledge as well, assuring Gilmour that Madison Financial was a large company with many investors and Ahlfeldt could not be expected to know about her accounts in particular. Such false reassurances also mitigated Gilmour's duty to investigate. (See, e.g., *Filosa v. Alagappan* (2020) 59 Cal.App.5th 772, 773 [patient who received false reassurances from physician about his symptoms was not on inquiry notice of his illness and injury].)

### 1.3. Defendants' arguments are not persuasive.

Defendants offer two related arguments as to why they think Gilmour's fraud claim was untimely. First, they claim that undisputed facts establish *as a matter of law* that Gilmour actually suspected Harrington of some misconduct prior to June 2011. As noted, a plaintiff's actual suspicion of wrongdoing or injury may be sufficient to trigger the limitations period. (*Jolly, supra*, 44 Cal.3d at pp. 1110–1111.) Defendants offer only one fact in support of their argument, however. Specifically, they assert that Gilmour scheduled a meeting with Ahlfeldt in 2010 "because she began to question her investments in Madison Financial," and after the meeting she was "more 'confused than before the meeting.'" Defendants then interpret her actions as follows: "This is an example of Gilmour having an actual suspicion that something was wrong, which led her to set up the meeting with Ahlfeldt, which in turn intensified her initial concern." They also suggest that "presumably she had decided to talk directly to Ahlfeldt in the first place because she did not want to rely on Harrington's assurances."

We disagree with defendants' claim that these facts lead to only one reasonable inference, i.e., that Gilmour suspected Harrington was defrauding her. As the court noted, Gilmour was

14

inexperienced and ill-equipped to manage her finances. Therefore, any "confusion" she may have experienced after the meeting with Ahlfeldt does not necessarily mean that she suspected any wrongdoing. Further, Gilmour may have reached out to Ahlfeldt for any number of reasons. Perhaps she wanted a second opinion about her investments. Or perhaps Harrington took a demeaning tone with her when discussing her investments and she felt uncomfortable about her lack of knowledge, causing her to seek out someone else for routine advice. Certainly, and contrary to defendants' assertion, the facts are not so clear that we can conclude as a matter of law that Gilmour actually suspected some wrongdoing prior to June 2011.

Alternatively, defendants assert that even if the facts do not require us to conclude that Gilmour actually suspected Harrington of wrongdoing, the undisputed facts establish that Gilmour was on inquiry notice more than three years before she filed her complaint. In other words, defendants claim, again *as a matter of law*, that any reasonable person would have suspected wrongdoing and investigated Harrington's actions before June 2011.

Not surprisingly, defendants do not discuss the entire record in making this claim and instead cherry-pick a few facts they contend are favorable to their position in an attempt to couch the issue as a matter of law. Importantly, however, the facts of this case were not entirely undisputed and many of the court's factual findings rest firmly on its credibility assessments of the witnesses—assessments we will not disturb. (See, e.g., *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008 (*O.B.*) [noting the appellate court "must indulge reasonable inferences that the trier of fact might have drawn from the evidence; it must accept

the fact finder's resolution of conflicting evidence; and it may not insert its own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment"].) In any event, and as discussed *ante*, substantial evidence supports the court's finding that Gilmour was not on inquiry notice of Harrington's fraudulent activity more than three years before she filed her complaint.

Finally, defendants emphasize the court's description of Gilmour[9] and suggest the court failed to apply an objective, reasonable person standard as required in analyzing the inquiry notice issue. They assert, for example, "the court decided that under the facts adduced at trial, a reasonable person would not have fallen for Harrington's deceit but that intrinsically, Gilmour was not the reasonably prudent person, so the court would therefore excuse her from the operation of the statute of limitations."

This assertion is not supported by the record. The court was plainly aware that Gilmour had little experience with and was ill-equipped to handle financial matters. But as we have already detailed, the court also observed that other friends and acquaintances of Harrington's—even people much more sophisticated than Gilmour—were taken in by Harrington, sometimes on multiple occasions.

---

[9] Defendants cite to the court's statement of decision in which the court describes Gilmour as "uneducated," "gullible," "extremely naïve," "not an intelligent woman," and "unknowledgeable about business or her own finances."

16

In sum, we cannot say as a matter of law that Gilmour was on either actual or inquiry notice more than three years before she filed her complaint.

## 2. Gilmour is entitled to prejudgment interest pursuant to Civil Code section 3287, subdivision (a), at a rate of seven percent per year.

The next issue for our consideration relates to the prejudgment interest calculation on the compensatory damages award. Defendants contend that two judgments were entered, one in February 2018 and another in April 2018, and only the judgment entered in February 2018 is valid. Defendants argue further that even if the judgment entered April 2018 is valid and is the final judgment, it must be reversed because the interest rate set by the court (10 percent per year) is incorrect. We agree with defendants' second point and will remand for recalculation of prejudgment interest.

### 2.1. Additional Facts

As noted, the court issued its final statement of decision on liability on September 18, 2017. Therein, the court found that approximately $325,000 of Gilmour's funds were deposited into Madison Financial's bank accounts for the benefit of all the defendants. The court did not explicitly state the amount of compensatory damages it intended to award on the fraud and conspiracy claims nor did it address the issue of prejudgment interest. But the court noted that, by stipulation of the parties, Exhibit 101 contained 53 checks written on Gilmour's account which were deposited into Madison Financial's bank account.

Gilmour later calculated the total of those checks to be $266,899.[10]

At the final hearing of the bifurcated trial on punitive damages, the court indicated it would issue a brief statement of decision. The court also indicated that it would award Gilmour prejudgment interest on the compensatory damages award. Specifically, the court said the judgment should include prejudgment interest of 10 percent on each check written from Gilmour's account "from the time it was taken," i.e., the day each check was deposited until the day judgment was to be entered. The court's statement of decision on punitive damages ordered Gilmour to prepare a final judgment.

In mid-January 2018, Gilmour submitted a proposed judgment and a bench brief regarding the calculation of compensatory damages and prejudgment interest, noting that the actual total of the 53 checks in Exhibit 101 was $266,899. Gilmour included a spreadsheet reflecting interest calculations at a rate of 10 percent running from the date each check was cashed to January 22, 2018. Defendants objected to the proposed judgment, suggesting that prejudgment interest should be awarded under Civil Code section 3291, and would therefore not begin to accrue until the date of Gilmour's settlement offer.

Although the defendants' position was contrary to the court's previous statements from the bench, the court was persuaded by defendants. In a minute order, the court stated that if Gilmour elected to proceed by tort, the amount of compensatory

---

[10] The court eliminated several checks written by Gilmour from its award because those checks had been written in 2007 but the bank records from Madison Financial which were introduced began in 2008.

18

damages was $325,000 and interest would be calculated under Civil Code section 3291 from the date of her settlement offer. If Gilmour elected to proceed on the common count, her damages were $275,000 and interest would be calculated under Civil Code section 3287. In either case, the court said, the applicable interest rate was 10 percent. The court directed Gilmour to prepare a new proposed judgment consistent with its minute order.

Due to several factors not relevant here, Gilmour submitted a document titled "second revised [proposed] judgment after bench trial" (second revised proposed judgment) which did not reflect the court's minute order. Gilmour also submitted a revised interest calculation spreadsheet (still calculating interest at 10 percent.) The second revised proposed judgment states, as pertinent here:

"IT IS THEREFORE ADJUDGED that:

"1. Plaintiff, CATHERINE GILMOUR SMITH recover judgment against Defendants GARY E. AHLFELDT, individually, and GARY E. AHLFEDLT, as the alter-ego of MADISON FINANCIAL, INC., and MADISON FINANCIAL, INC., jointly and severally, the sum of $505,030.63, consisting of compensatory damages plus interest through February 15, 2018; $1,000,000.00, as and for punitive damages, for a total of $1,505,030.63, plus costs[.]"

It appears that the court signed this document (the February judgment) on February 16, 2018, which defendants represent is the same day the trial judge retired. It also appears that the court modified the paragraph by interlineation[11] to read:

_____

[11] The court's insertions are in brackets and in italics. The court's strike-outs are so represented.

19

"1. Plaintiff, CATHERINE GILMOUR SMITH recover judgment against Defendants GARY E. AHLFELDT, individually, and GARY E. AHLFEDLT, as the alter-ego of MADISON FINANCIAL, INC., and MADISON FINANCIAL, INC., jointly and severally, the sum of ~~$505,030.63, consisting of~~ [*$325,000*] compensatory damages plus interest [*plus* [*sic*] *pursuant to CC § 3291 from date of CCP § 998 offer to 2/15/2018*] ~~through February 15, 2018~~; $1,000,000.00, as and for punitive damages, for a total of $1,505,030.63, plus costs[.]"

Gilmour filed a motion to correct the February judgment under Section 663, noting the court had previously ruled from the bench that with respect to the compensatory damages award, prejudgment interest would be calculated separately for each check written from Gilmour's account, and would begin accruing on the date the check had been deposited. Gilmour requested that the court sign the second revised proposed judgment as originally submitted, consistent with the court's ruling from the bench.

Defendants also filed a motion to correct the February judgment. They asserted that the total amount of that judgment—$1,505,030.65—was inconsistent with the legal basis for the interest calculation as interlineated by the court. A correct calculation—10 percent interest on $325,000 from January 22, 2016 (the date of Gilmour's settlement offer) to February 15, 2018—would be approximately $65,000 and would bring the total judgment to $1,390,000.

Ultimately, the court (with a new trial judge assigned) heard these motions concurrently and determined that the total amount of compensatory damages was $266,899, as calculated by Gilmour. Further, the court reviewed the transcript from the final hearing on punitive damages and found that, according to

20

the court's ruling from the bench, Gilmour was entitled to prejudgment interest under Civil Code section 3287, subdivision (a) at a rate of 10 percent, beginning when each check was deposited and continuing until February 15, 2018. On both points, the court found, Gilmour's second revised proposed judgment—as originally submitted—was correct and should be signed, effective as of February 15, 2018. The court signed a copy of the second revised proposed judgment. It was filed on April 20, 2018 and entered nunc pro tunc as of February 15, 2018.

### 2.2. Analysis

Initially, we note that the parties disagree as to which of the two possible "judgments" is the final judgment properly before us—the judgment signed by the court on February 16, 2018 or the judgment signed by the court on April 20, 2018 and made effective nunc pro tunc as of February 15, 2018. As our analysis indicates, however, both proffered judgments contain errors that require modification. We therefore find it unnecessary to resolve the question and move directly to defendants' assertions of error.[12]

### 2.2.1. Gilmour is entitled to prejudgment interest under Civil Code section 3287, subdivision (a).

The dispute about which judgment is the operative final judgment is, at its core, a dispute about the statutory basis for the court's prejudgment interest award.

Defendants seek to enforce the court's February 7, 2018 minute order, reflected by the interlineations in the February

---

[12] As noted, defendants timely appealed from both possible judgments.

21

judgment, which stated that Gilmour was entitled to prejudgment interest under Civil Code section 3291. Under that provision, interest on the compensatory damages award would not begin to accrue until January 22, 2016, the date Gilmour served her offer to compromise under section 998. (Civ. Code, § 3291.) But the statute expressly states that it is applicable only in tort actions brought to recover damages for personal injury. This is not a personal injury case and the court therefore erred in awarding prejudgment interest under that section.

The court was partially correct the first time it addressed the prejudgment interest issue, however. As noted, the court initially stated from the bench that Gilmour was entitled to prejudgment interest running from the date each of her checks was cashed by defendants to the date judgment was entered. Civil Code section 3287 supports the court's ruling. Specifically, that section provides in subdivision (a) that "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt." Damages are deemed certain or capable of being made certain within Civil Code section 3287, subdivision (a), where there is essentially no dispute between the parties concerning the basis of imposition of damages that are recoverable but where the dispute centers on the issue of liability giving rise to the damages. (*Stein v. Southern Cal. Edison Co.* (1992) 7 Cal.App.4th 565, 571.) "Two tests apply in deciding the certainty required by section 3287, subdivision (a): (1) whether the debtor knows the amount owed or (2) whether the debtor would be able to compute

the damages, i.e., whether they are reasonably calculable." (*Id*. at pp. 571–572.) Both tests are plainly satisfied here. The amounts taken from Gilmour are definite in amount, as reflected by the checks she wrote. And the date of each harm is also certain, as reflected by banking records from Madison Financial showing when Gilmour's checks were cashed and/or deposited, enabling a certain calculation of Gilmour's damages.

Accordingly, Gilmour is entitled to prejudgment interest under Civil Code section 3287, subdivision (a).

### 2.2.2. The court erred in setting the rate of interest at 10 percent per year.

Alternatively, defendants argue that if prejudgment interest is to be awarded, it is capped at seven percent per year. We agree.

Whether the proper interest rate was applied is a question of law. (See *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1585.) The California Constitution sets the rate of interest on judgments at seven percent per year. (Cal. Const., art. XV, § 1.) The Legislature is permitted to set a different rate, not to exceed 10 percent per year and has, for example, raised the rate of postjudgment interest to 10 percent per year. (§ 685.010, subd. (a).) But there is no legislative act specifying the rate of prejudgment interest for a fraud claim, and therefore the constitutional rate of seven percent applies here. (Cal. Const., art. XV, § 1; *Michelson*, at pp. 1585–1586; *Continental Airlines, Inc. v. McDonnell Douglas Corp*. (1989) 216 Cal.App.3d 388, 434.) The court therefore erred in setting the prejudgment interest rate

at 10 percent and we will remand for recalculation of prejudgment interest at the appropriate rate.[13]

### 3. The punitive damages award must be reduced because it is unconstitutionally excessive.

Defendants challenge the punitive damages award on two grounds: lack of substantial evidence of malice, oppression, or fraud, and unconstitutional excessiveness. We conclude the finding of malice, oppression or fraud is supported by substantial evidence. But in light of the evidence of defendants' financial circumstances, we conclude the punitive damages award is excessive and must be reduced.

### 3.1. Additional Facts

As noted, the court held a bifurcated trial on punitive damages over several days in October 2017 and later issued a detailed statement of decision. The court revisited its findings from the trial on liability, noting that it had previously found by clear and convincing evidence that Harrington, Madison Financial, and Ahlfeldt "engaged in an intentional, oppressive, malicious and fraudulent conspiracy to steal funds from" Gilmour[14] and use those funds for the benefit of Harrington,

---

[13] In making that calculation, the court should refer to Exhibit 101:1-53 and the interest calculation spreadsheet submitted to the court by Gilmour on February 15, 2018 in support of her reply to the court's minute order of February 7, 2018.

[14] We reject defendants' claim that the court "never actually made a finding of malice, oppression, or fraud as to Ahlfeldt or Madison Financial." The judgment on liability expressly found that Harrington was liable for fraud and deceit, that he acted with malice, oppression and fraud, that Ahlfeldt was also liable for fraud as a co-conspirator,

24

Fisher, and to a lesser extent Ahlfeldt and Madison Financial. Further, "[a]lthough Ahlfeldt's and Madison Financial's gain was smaller than Harrington's and Fisher's, the Court found that Ahlfeldt and Madison Financial fully participated in the conspiracy to acquire these funds by fraud and misrepresentation and to use the funds for their own financial purposes." In particular, Ahlfeldt had used Madison Financial illegally as a front for Harrington to launder Gilmour's money.

The court summarized the legal principles governing an award of punitive damages noting that the court had wide discretion to award punitive damages for the purpose of punishing and deterring future unlawful conduct by a defendant. The court correctly identified relevant legal factors including the degree of reprehensibility of a defendant's conduct, the harm to the plaintiff, and the defendant's wealth and ability to pay. The court also noted that a punitive damages award must generally be in some reasonable proportion to the actual damage suffered by the plaintiff.

As to Ahlfeldt, the court found a high degree of reprehensibility in his conduct. Specifically, Ahlfeldt knew that Harrington was a convicted felon and con man. He also knew, as the sole shareholder and owner of Madison Financial, that Gilmour had no business relationship with Madison Financial. Notwithstanding that knowledge, Ahlfeldt accepted Gilmour's checks from Harrington, deposited them, disbursed the funds as Harrington directed, and used some of the funds to benefit

---

and that Ahlfeldt was "liable for all damages to which Gilmour is entitled."

himself. Ahlfeldt continued this pattern over the course of four years and laundered more than 50 checks worth $325,000, even after he knew, following a meeting with Gilmour in June 2010, that she believed her money was being invested—a fact that directly contradicted Harrington's claim that Gilmour was "taking care of him." And perhaps worst of all, Ahlfeldt concealed all these facts from Gilmour when she asked him directly about the performance of investments she believed were held by Madison Financial. The court also observed that defendants stole the majority of Gilmour's life savings, which she had painstakingly earned from a part-time modeling career over more than 20 years. Given the high degree of reprehensibility, the court concluded that a punitive damages award should be a multiple of the actual damages caused.

As to defendants' financial condition, the court heard evidence from Gilmour's financial expert that the financial records produced by Ahlfeldt and Madison Financial were produced in substantial disarray. "Repeatedly the photo copy of a front page of a credit card bill dated one month, had an unrelated bill from a different month and year and at times a different company photocopied on the back side. Two sided copies, all in no monthly or yearly order from front to back or manner of production, was the norm. There were four boxes of such records making it impossible for a forensic CPA to make hide nor hair of the documents." In addition, the records produced were grossly incomplete (e.g., no balance sheets, no income statements, no general ledger) and what was produced indicated that Madison Financial operated outside conventional business standards and failed to use generally accepted accounting practices. As a result of what the court found was "a successful effort at obfuscation" by

26

defendants, Gilmour's expert was unable to estimate defendants' net worth with any degree of certainty.

The materials produced by Ahlfeldt and others did provide some relevant information, however. Using the available information, including records produced by a real estate company for whom Ahlfeldt sometimes worked, the court made the following factual findings:

- ◦ Between 2011 and 2017, not including 1099 income, Ahlfeldt deposited $1,072,567.09 into his personal accounts.

- ◦ During that period, the real estate company records show Ahlfeldt received $491,557 in reported (1099) commissions.

- ◦ Ahlfeldt received unreported commissions of $375,000 (2014), $7,800 (2015), and $120,337.50 (2016).

- ◦ Ahlfeldt expected to receive a commission of $219,260 shortly after the trial and had recently received a check for $237,000 which he said was a reimbursement.

- ◦ Ahlfeldt's annual expenses (rent, insurance, miscellaneous) are approximately $67,000.

The court also found that "[g]iven Ahlfeldt's long record of success as a real estate broker and in property lease and management, his prospects for continued future earning are good to excellent."

At the final hearing on punitive damages, the court indicated that its tentative ruling was to award a total of

$100,000 in punitive damages, payable over three years. The court said that it believed this ruling was appropriate in light of all the factors, including that Ahlfeldt appeared to earn in the neighborhood of $200,000 to $225,000 each year. Gilmour's counsel urged the court to raise the award to a multiple of the compensatory award, citing the reprehensibility of Ahlfeldt's conduct as well as his intentional obfuscation of the financial condition issue. Ultimately, in its final statement of decision, the court awarded punitive damages of $500,000 each against Ahlfeldt and Madison Financial, jointly and severally.

### 3.2. Substantial evidence supports the court's finding that Ahlfeldt acted with malice, oppression, or fraud.

Defendants assert that the court's finding that Ahlfeldt (and by extension Madison Financial) acted with malice, oppression, or fraud in conspiring with Harrington to commit fraud is not supported by substantial evidence. We disagree.

To support a punitive damages award, the plaintiff must prove by clear and convincing evidence that the "defendant has been guilty of oppression, fraud, or malice[.]" (Civ. Code, § 3294, subd. (a).) Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (*Id*., subd. (c)(1).) " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (*Id*., subd. (c)(2).) " 'Despicable conduct' is conduct that is ' "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by most ordinary decent people." ' [Citation.]" (*Butte Fire Cases* (2018) 24

Cal.App.5th 1150, 1159.) Typically, such conduct has "the character of outrage associated with crime." (*Ibid*.) Finally, " '[f]raud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).)

Malice and oppression may be proven through direct evidence or inferred from the circumstances surrounding the defendant's conduct. (*Monge v. Superior Court* (1986) 176 Cal.App.3d 503, 511.) Because malice, oppression, or fraud must be proven by clear and convincing evidence, we review the court's finding to determine "whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*O.B.*, *supra*, 9 Cal.5th at p. 1005.) We therefore view "the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id*. at p. 996.)

The court concluded that defendants acted with malice, oppression, *and* fraud. Defendants, however, contend none of those factors is present in this case and characterize the evidence of their wrongdoing as "not particularly strong," and certainly not sufficient for the court to find they acted with the requisite intent by clear and convincing evidence.

We begin, and end, with defendants' claim that "concerning 'fraud,' the record does not support a finding by clear and convincing evidence that Ahlfeldt intentionally made any

misrepresentations to Gilmour, or deceived or concealed a known material fact from her with the intent of causing injury." Our Supreme Court has held that "[p]unitive damages are recoverable in those fraud actions involving intentional, but not negligent, misrepresentations. [Citations.]" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1241.) Here, we need only look to the June 2010 meeting between Gilmour and Ahlfeldt to find intentional fraudulent misrepresentation and concealment. As discussed *ante*, when Gilmour asked Ahlfeldt about her investments with Madison Financial, he said only that he was "not aware" of her investments. We agree with the court's finding that "[a]t the very least, this conversation was a red flag and put Ahlfeldt on notice that Gilmour believed she had investments with Madison Financial." But the evidence also demonstrates that Ahlfeldt intentionally concealed the truth from Gilmour. He knew, but did not disclose, that Madison Financial did not make investments for clients and was not investing money for her. He knew, but did not disclose, that Harrington was spending Gilmour's money—more than $300,000 at the time of their meeting in June 2010—on himself and others, including Ahlfeldt. And Ahlfeldt knew, but did not disclose, that he had been told many years earlier by a private detective that Harrington was a convicted felon and a con man.

This conduct by Ahlfeldt was not negligent. It was not an oversight. It was intentional, it was designed to perpetuate the fraudulent scheme, and it was designed to harm Gilmour for Harrington's (and Ahlfeldt's) benefit. This conduct provides more than sufficient evidence to support the court's finding, by clear and convincing evidence, that Ahlfeldt acted with a fraudulent intent within the meaning of Civil Code section 3294.

### 3.3. The punitive damages award is unconstitutionally excessive.

Defendants next contend that the punitive damages award is excessive and should be reversed. We agree but conclude that the court's initial assessment of punitive damages, as stated in the court's tentative and from the bench, is supported by substantial evidence.

Courts may impose punitive damages to further a state's interest in punishing and deterring unlawful conduct. (*State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416 (*State Farm*).) But the Fourteenth Amendment's due process clause places limitations on the amount of punitive damages awards, prohibiting the imposition of grossly excessive or arbitrary punishments on tortfeasors. (*Ibid.*; see also *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712 (*Roby*) [the due process clause restricts the amount of punitive damages courts may award].) " '[E]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " (*State Farm,* at pp. 416–417.)

In *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, (*Gore*), the United States Supreme Court outlined three "guideposts" that courts should use to determine whether a punitive damages award is excessive under the due process clause: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in

31

comparable cases.[15] (*Id.* at p. 575; see also *State Farm, supra*, 538 U.S. at p. 418; *Roby, supra*, 47 Cal.4th at p. 712.)

We review the constitutionality of a punitive damages award de novo. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172.) Nevertheless, we review "findings of historical fact" for substantial evidence. (*Ibid.*)

First Guidepost: Degree of Reprehensibility

"Of the three guideposts that the high court outlined in *State Farm, supra*, 538 U.S. at page 418, the most important is the degree of reprehensibility of the defendant's conduct. On this question, the high court instructed courts to consider whether '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' (*Id.* at p. 419.)" (*Roby, supra*, 47 Cal.4th at p. 713.)

The facts pertinent to our assessment of the reprehensibility of the conduct by Harrington, Ahlfeldt, and Madison Financial are, for the most part, discussed *ante* in our analysis of the court's finding of malice, oppression, or fraud. Accordingly, we summarize them briefly. As to the first factor, Gilmour's harm was primarily economic[16] but the court did find

---

[15] Defendants correctly observe that the third factor is not relevant in this case.

[16] As to Gilmour's physical harm, the court concluded Ahlfeldt had no advance knowledge of Harrington's assault and rape.

that Gilmour suffered "extreme distress and resulting psychological damages." Similarly, as to the second factor, Gilmour's health and safety (and that of her two children) were not directly placed at risk by the fraudulent financial scheme, though as just noted the assault, rape, and theft of her life savings impacted her health to some extent. The remaining factors, however, are present to a significant degree in this case. The third factor—financial vulnerability of the victim—is evident to a great degree, as already discussed. Gilmour was recently divorced from a successful businessman, she was uneducated about finances generally and her own finances in particular, and as a general matter Gilmour presented as naïve and gullible. As to the fourth factor—repeated actions versus a single incident— the scheme here continued over four years and during that time, Ahlfeldt cashed more than 50 checks from Gilmour. The final factor—intentional versus accidental conduct—we discussed at length *ante* and concluded that Ahlfeldt's conduct was intentional. In short, substantial evidence supports the court's finding that there is a high degree of reprehensibility here.

Second Guidepost: Disparity Between Actual Harm and Award

Punitive damages must bear a " 'reasonable relationship' " to compensatory damages or the plaintiff's actual harm. (*Gore*, *supra*, 517 U.S. at pp. 580–581.) "Generally, California courts 'have adopted a broad range of permissible ratios—from as low as one to one to as high as 16 to 1—depending on the specific facts of each case.' [Citation.]" (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1313 (*Pfeifer*).) But there is no "bright-line ratio which a punitive damages award cannot exceed." (*State Farm*, *supra*, 538 U.S. at p. 425.)

" '[D]ue process permits a higher ratio between punitive damages and a small compensatory award for purely economic damages containing no punitive element than [it does] between punitive damages and a substantial compensatory award for emotional distress; the latter may be based in part on indignation at the defendant's act and may be so large as to serve, itself, as a deterrent.' " (*Roby*, *supra*, 47 Cal.4th at p. 718.) Thus, in evaluating whether a punitive damages award falls within constitutional limits, reviewing courts should look to whether the compensatory damages award is punitive in nature, such as a substantial award for emotional suffering caused only by economic harm. (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1313.)

Defendants do not argue the relationship between the compensatory award and the punitive award is unreasonable. And they do not contend the punitive award is suggestive of passion and prejudice on the part of the court. Nor could they. The only compensatory damages award is reflective of Gilmour's actual damages. She received no additional damages for, e.g., emotional distress.

Further, the ratio of punitive damages to compensatory damages is less than 1.5 to 1, as the court imposed punitive damages of $500,000 against each defendant, over and above the compensatory award of $325,000, or less than 1.9 to 1 if the award is corrected to reflect compensatory damages of $266,899. And even if we consider that the award was made jointly and severally, potentially leaving Ahlfeldt to pay the entire $1 million, the ratio is still less than 4 to 1, well within the range of awards held to pass constitutional muster where, as here, the compensatory damages represent a plaintiff's actual damages. (See, e.g., *Roby, supra*, 47 Cal.4th at p. 718 [" '[D]ue process

34

permits a higher ratio between punitive damages and a small compensatory award for purely economic damages containing no punitive element than [it does] between punitive damages and a substantial compensatory award for emotional distress; the latter may be based in part on indignation at the defendant's act and may be so large as to serve, itself, as a deterrent' "]; *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 458 [citing *State Farm, supra*, and noting that " 'in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process' "].)

Defendants' Wealth and Ability to Pay the Award

The main focus of defendants' challenge to the punitive damages award is their asserted inability to pay the award. Gilmour does not address the issue in her respondent's brief.

Under California law, in addition to the factors discussed above, courts evaluating the possible excessiveness of a punitive damages award consider " 'in view of the defendant[s'] financial condition, the amount necessary to punish him or her and discourage future wrongful conduct.' " (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679 (*Baxter*); see *Adams v. Murakami* (1991) 54 Cal.3d 105, 110 (*Adams*).) "[O]bviously, the function of deterrence ... will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 (*Neal*); see *Adams*, at p. 110.) "The purpose of punitive damages 'is not served by financially destroying a defendant. The purpose is to

35

deter, not to destroy.' " (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 546 (*Walsh*); see *Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 192 (*Soto*) [punitive damages award is excessive if " 'it destroys, annihilates, or cripples the defendant' "].) " 'An appellate court may reverse an award of punitive damages only if the award appears excessive as a matter of law or is so grossly disproportionate to the ability to pay as to raise a presumption that it was the result of passion or prejudice.' " (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 535.)

Generally, "an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Adams*, *supra*, 54 Cal.3d at p. 109; see *Soto*, *supra*, 239 Cal.App.4th at p. 192; *Walsh*, *supra*, 158 Cal.App.4th at p. 546 ["a defendant's ability to pay a punitive damage award must be based on meaningful and substantial evidence of his or her financial condition"].) "Without such evidence, a reviewing court can only speculate as to whether the award is appropriate or excessive," and as with compensatory damages, a punitive damages award "must not be based on speculation." (*Adams*, at pp. 112, 114.) Under *Adams,* the plaintiff has the burden of proving the defendant's financial condition to obtain punitive damages. (*Id*. at pp. 119–123.)

"Our Supreme Court has not prescribed a rigid standard for measuring a defendant's ability to pay. [Citations.] Accordingly, there is no particular type of financial evidence a plaintiff must obtain or introduce to satisfy its burden of demonstrating the defendant's financial condition. Evidence of the defendant's net worth is the most commonly used, but that metric is too susceptible to manipulation to be the sole standard for measuring a defendant's ability to pay. [Citations.] Yet the 'net' concept of

36

the net worth metric remains critical. 'In most cases, evidence of earnings or profit alone are not sufficient "without examining the liabilities side of the balance sheet." [Citations.]' [Citations.] Evidence of a defendant's income, standing alone, is not ' "meaningful evidence." ' [Citation.] 'Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income.' " (*Soto*, *supra*, 239 Cal.App.4th at p. 194; see *Baxter, supra*, 150 Cal.App.4th at p. 680.) "Whether the defendant's financial prospects are bleak or bright [also] is relevant to the ultimate issue whether the damages will ruin him or be absorbed by him." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 622.)

As noted above, the court heard evidence relating to Ahlfeldt's income and found that on average, he earned approximately $225,000 per year. Although defendants' precise calculations differ slightly from the court's, the $225,000 annual income figure is supported by the evidence and defendants do not contend otherwise. The court also found that "[g]iven Ahlfeldt's long record of success as a real estate broker and in property lease and management, his prospects for continued future earning are good to excellent." Defendants do not challenge that finding and the record supports it.

As noted above, however, earnings and a bright future are typically not sufficient, standing alone, to establish a defendant's ability to pay a punitive damages award. And although Ahlfeldt plainly made the examination of his financial records difficult, the records and his undisputed testimony show that Ahlfeldt has a modest amount of assets. He owns no real estate, having lost his home to foreclosure. And his remaining assets—a selection of stocks and investment accounts—total just under $300,000, not

37

including a limited number of shares of stock with uncertain value. These facts gave the court some sense of Ahlfeldt's individual wealth and even if the court believed the picture was incomplete, it was still required to tether its award to the facts in evidence. (*Adams, supra*, 54 Cal.3d at pp. 112, 114 [a punitive damages award "must not be based on speculation"].)

The more difficult assessment relates to Madison Financial. Gilmour's forensic accountant emphasized that Ahlfeldt had not produced the sort of financial records that would typically be used in assessing a company's net worth—a general ledger, profit and loss statements, business records documenting cash flow— and she was therefore unable to assess Madison Financial's net worth with any degree of certainty. But the court heard evidence that those records were never created and maintained by Ahlfeldt because the company had very little legitimate business and was being used primarily to launder money for Harrington. None of the testimony presented suggested that Madison Financial owned any real property or other assets. Ahlfeldt testified that the company generated revenue of $9,600 in 2017. And Madison Financial's banking records showed that the company had approximately $600 in its account.

In short, the record does not support the court's finding that Ahlfeldt and Madison Financial can reasonably pay a $1 million punitive damages award in addition to the compensatory award. That amount is more than three times the value of Ahlfeldt's known assets and more than four times his average annual income. Typically, punitive damages awards relate to a percentage of a defendant's assets—not a multiple.

We agree with the court that some award of punitive damages is appropriate, however, particularly in light of the facts

we have already described. After examining the record, we conclude that the court's tentative ruling—in which the court indicated it would award punitive damages of $100,000 payable over three years—is supported by the evidence and we reduce the award accordingly.

## DISPOSITION

The judgment is modified to provide that plaintiff Catherine Gilmour Smith is entitled to compensatory damages of $266,899 plus prejudgment interest pursuant to Civil Code section 3287, subdivision (a), and at a rate of seven percent per year. The judgment is further modified to provide a punitive damages award against Gary Ahlfeldt and Madison Financial, Inc., jointly and severally, in the total amount of $100,000. As so modified the judgment is affirmed and the cause remanded to the trial court for calculation of prejudgment interest. Catherine Gilmour Smith shall recover her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.